**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COLUMBIA**

| | | |
|---|---|---|
| DISTRICT OF COLUMBIA, | : | |
| | : | [Removal from the Superior Court of |
| Plaintiff, | : | the District Columbia, Case No.: 2020 |
| | : | CA 002697 B] |
| v. | : | |
| | : | |
| ELEVATE CREDIT, INC., | : | Civil Action No.:_____ |
| | : | |
| Defendant. | : | |
| | : | |

## NOTICE OF REMOVAL

Defendant Elevate Credit, Inc. ("Elevate") hereby removes this civil action from the Superior Court of the District Columbia to the United States District Court for the District of Columbia.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1441.

The Complaint in this action challenges interest rates lawfully charged by state-chartered banks under a federal statutory and regulatory scheme administered by the Federal Deposit Insurance Corporation ("FDIC").  The Complaint similarly challenges Elevate's lawful role as a service provider for state-chartered banks, a role also regulated by the FDIC.  The Complaint's Counts are dependent on interest rate allegations that give rise to complete preemption under federal law and the allegations implicating the FDIC's pervasive regulatory oversight raise significant questions of federal law.  Both provide grounds for removal under controlling law.

In further support of this Notice of Removal, Elevate states as follows:

## PROCEDURAL HISTORY

1.      On June 5, 2020, Plaintiff, the District of Columbia (the "District"), filed this action in the Superior Court of the District Columbia, Case Number 2020 CA 002697 B.

2.     On June 5, 2020, Elevate, by counsel, accepted service of the Complaint, Summons, Initial Order and Information Sheet.  True and correct copies of the Complaint, Summons, Initial Order and Information Sheet are attached as <u>Exhibit 1</u>.

3.     On June 22, 2020, the parties filed a Consent Motion Extending Time for Defendant to Respond to the Complaint. A true and correct copy of the Motion is attached as <u>Exhibit 2</u>.

4.     On June 29, 2020, the Court granted Elevate's motion.  A true and correct copy of the Order granting Elevate's Motion to Extend is attached as <u>Exhibit </u>3.

5.     The documents attached as Exhibits 1, 2, and 3 constitute all of the process, pleadings, and orders served on Elevate, and are attached pursuant to 28 U.S.C. § 1446(a).

## TIMELINESS OF REMOVAL

6.     Elevate's removal notice is timely under 28 U.S.C. § 1446(b). It is filed within thirty (30) days after service of the Summons and Complaint on June 5, 2020.

## VENUE

7.     The Superior Court of the District of Columbia is located within the United States District Court of the District of Columbia. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 88 because it is "the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

## BACKGROUND FOR THIS REMOVAL PETITION

8.     The Complaint challenges the legality and compliance with Washington, District of Columbia ("D.C.") usury laws of certain loans offered be state-chartered banks to, and in some cases accepted by, D.C. residents.  The District acknowledges that the loans were made by two state-chartered banks: FinWise Bank ("FinWise"), a Utah chartered bank, and Republic Bank &

Trust Company ("Republic"), a Kentucky chartered bank (collectively, the "state-chartered banks"). Compl. ¶¶ 10 and 22.

9.      According to the Complaint, Elevate allegedly provided marketing, underwriting, and other services to FinWise and Republic in connection with their loans.

10.      The District asserts four claims against Elevate under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901, *et seq.* Complaint ¶¶ 80-103.

11.      In Count One, the District alleges that Elevate made misrepresentations and omissions in violation of § 28-3904(b), (e), (f) and (f-1). Complaint ¶ 80-88. The District maintains that Elevate expressly or impliedly misrepresented that it had a money lender license required for lenders that are otherwise exempt. *Id.* ¶ 86. The District also maintains that Elevate represented that the offer of the loans through FinWise and Republic was legal, when the District maintains that it was illegal. Further, the District maintains that Elevate failed to disclose or adequately disclose that the loans contain an APR in excess of the D.C.'s usury limits, which purportedly apply to these loans made through FinWise and Republic. Complaint ¶ 88(a).

12.      In Count Two, the District alleges unfair and unconscionable practices in violation of 28-3904(r). Complaint ¶¶ 89-92. The District alleges that Elevate, by its conduct in connection with the loans made through FinWise and Republic was "knowingly offering, providing, servicing, and marketing predatory, high-cost loans" to D.C. consumers. Complaint ¶ 91.

13.      In Count Three, the District alleges that Elevate violated § 28-3904(ff) and the prohibition against engaging in unfair or deceptive trade practices. Complaint ¶¶ 93-99. This alleged violation is premised on the usury limits found in §§ 28-3301(a), § 28-3308(a), and 28-3302(a). Complaint ¶ 95.

14.     In Count Four, the District alleges that Elevate violated D.C. Municipal Regulations by loaning money without obtaining a license as a money lender under 16 DCMR §§ 201.1 and 200.4.  The District asserts that this is an unlawful trade practice under § 28-3904(dd).

## FEDERAL REGULATION OF STATE-CHARTERED BANKS AND THEIR SERVICE PROVIDERS

### The Relationship Between Elevate and the State-Chartered Banks

15.     The Complaint contains various conclusory allegations that obscure the nature of the activities in which the state-chartered banks and Elevate engage and the relationship between Elevate and the state-chartered banks.  These activities and those relationships are, however, critical to the basis for this removal petition.

16.     At the core of each of the claims against Elevate is the allegation that loans made by FinWise and Republic were illegal because they violated D.C. usury laws.  Allegations that the interest rates in the loans are unlawful, unfair, unconscionable or deceptive are contained in each Count.

17.     The state-chartered banks' loan programs, their loans, their interest rates and Elevate's role as a service provider for each state-chartered bank are each regulated under a statutory structure enacted by Congress and administered by the FDIC.

18.     Consistent with that federal statutory scheme, the state-chartered banks, FinWise and Republic Bank, respectively, operate lawfully in D.C. under longstanding and uncontested banking principles that allow exportation of interest rates from the states in which each bank is located.

19.     That same federal regulatory scheme also allows the state-chartered banks to engage service providers like Elevate to facilitate banking operations under the auspices of the

longstanding and well-developed body of federal law and regulatory guidance that encompasses the activities of Elevate and the state-chartered banks without regard to state usury laws.

### Elevate's Role as Service Provider

20.     Elevate offers online solutions that allow banks to originate loans and line of credit products.  Declaration of Scott Greever ("Greever Decl.") ¶ 2, attached as Exhibit 4.  Elevate provides marketing services to banks in connection with those credit products.  It also licenses to banks its website, technology platform and proprietary credit and fraud scoring models to support the banks' origination and servicing of credit products to consumers.  *Id.*

21.     Elevate is a technology and marketing service provider to the state-chartered banks. Complaint ¶¶ 10, 22; Greever Decl. ¶ 3.

22.     It provides its technology platform and marketing services in connection with the Elastic line of credit product, originated by Republic, and RISE installment loan product, originated by FinWise.  Complaint ¶ 20; Greever Decl. ¶ 4.  Both programs were offered to residents in D.C.; the state-chartered banks have ceased lending in D.C. *Id.*

23.     Elevate and FinWise executed a Joint Marketing Agreement and a Technology and Support Agreement related to the FinWise RISE loan product.  Greever Decl. ¶ 5.  Elevate and Republic executed a Joint Marketing Agreement and a License and Support Agreement related to the Republic Elastic line of credit product.  *Id.*  Elevate's role as service provider in connection with these credit programs is set forth in those contracts.  *Id.*

24.     In its role as service provider, Elevate supports the state-chartered banks' operational activities related to the FinWise RISE and Republic Elastic lending programs.  Greever Decl. ¶ 6.

25.     Elevate provides underwriting support to FinWise and Republic.  Greever Decl. ¶ 7.  FinWise and Republic control and approve the underwriting criteria and terms and conditions related to the FinWise Rise and Republic Elastic programs.  *Id.*  FinWise and Republic establish the underwriting guidelines that apply to those programs.  *Id.*  Elevate presents to FinWise and Republic suggested underwriting criteria in accordance with those guidelines.  *Id.*  Upon approval by FinWise and Republic, Elevate implements that criteria through the platform each bank licenses from Elevate to originate their respective credit products.

26.     Elevate also assists in creating marketing collateral for each credit program.  Complaint ¶ 17; Greever Decl. ¶ 8.  FinWise and Republic establish the parameters for the marketing services Elevate is obligated to perform.  *Id.*  Elevate creates and presents to FinWise and Republic drafts of marketing materials in accordance with those guidelines.  Complaint ¶ 25; *Id.*  The state-chartered banks review, edit and approve the content and means of disseminating all marketing collateral related to their respective programs.  *Id.*  This review and approval process is documented by Elevate; marketing material is not disseminated until it is approved.  *Id.*  Specifically, Elevate is required by contract to disclose that FinWise is the lender and creditor for the FinWise RISE program and that Republic is the lender and creditor for the Republic Elastic program.  *Id.*

27.     Elevate employs a similar process for legal disclosures related to the FinWise RISE and Republic Elastic loans.  Greever Decl. ¶ 9.  FinWise and Republic control and approve the content of all disclosures related to their respective programs.  *Id.*  Those disclosures state that FinWise and Republic are the lenders and creditors for FinWise RISE and Republic Elastic credit products, respectively.  *Id.*

28.     FinWise and Republic each maintain a consumer compliance management program for their credit products.  Greever Decl. ¶ 10.  Pursuant to these compliance programs, Elevate is required to: (i) perform and submit to regular and ongoing testing by each bank; (ii) perform and submit to regular and ongoing audits by each bank; and (iii) report any program-related issues to the banks (among other things).  *Id.*  FinWise and Republic each conduct regular on-site visits to Elevate.  *Id.*  Each bank also has a compliance team that interfaces on an ongoing basis with Elevate on a range of compliance matters concerning Elevate's support of the FinWise RISE and Republic Elastic products.  *Id.*

29.     Elevate provides limited support to FinWise and Republic after each bank originates loans under their respective credit programs.  Greever Decl. ¶ 11.  The platforms that FinWise and Republic license from Elevate support automated and self-servicing activities for customers.  *Id;* Complaint ¶ 20.  FinWise and Republic contract directly with independent third parties that provide telephone and other real-time support to FinWise RISE and Republic Elastic borrowers.  *Id.*  The state-chartered banks and/or their other independent service providers process ACH files, ad hoc payments, and customer-service-initiated payments for the FinWise RISE and Republic Elastic programs.  *Id.*

30.     Elevate does not own or purchase any interest in FinWise RISE or Republic Elastic credit products.  Greever Decl. ¶ 12.

### FDIC Regulatory Oversight of State-Chartered Banks

31.     In all aspects of their lending and their relationship with Elevate, the state-chartered banks are subject to statutes, regulations and regulatory guidance administered by the FDIC.  The FDIC supervises and regulates state-chartered banks (and other institutions) by identifying, monitoring and addressing risks in order to promote the stability of the nation's banking system.

32.     With respect to the allegations in the Complaint, the charging of interest rates and their exportation falls within the FDIC's regulatory prerogative as applied to state-chartered banks. The FDIC is regulatory oversight of state-chartered banks squarely encompasses the interest rates the banks charge in connection with their respective loan programs.   The regulatory scheme permits the banks to export interest rates from the states in which they are located to avoid discrimination against state-chartered lenders.  12 U.S.C. § 1831d(a).

33.     The federal statutes and operative regulatory scheme expressly contemplate that the enforcement of state usury laws will be impacted by federal regulation.   The federal statutory structure impairs the enforcement of state usury laws to the extent they would frustrate the exportation of interest rates by a state-chartered bank and thereby discriminate against those banks, and adversely affect their financial stability.

**FDIC Regulatory Oversight of State-Chartered Bank Service Providers**

34.     Under the FDIC's regulatory auspices, the state-chartered banks must monitor and oversee Elevate in its role as a service provider.  12 U.S.C. § 1820(d)(1); 12 C.F.R. § 337.12(a).

35.     The Bank Service Company Act allows the state-chartered banks to engage service providers like Elevate, by contract or otherwise, to perform bank-related function on behalf of the bank.  12 U.S.C. § 1867(c).  Those service providers are subject to regulation and examination by the FDIC as if the services were provided by the bank itself.  12 U.S.C. § 1867(c)(1).

36.     The FDIC also establishes the requirements and responsibilities concerning the state-charted banks' risk-management procedures and due diligence in monitoring their third party service providers.  The FDIC holds the state-chartered banks responsible for their relationships with third party providers, including service providers like Elevate.   12 U.S.C. §§ 1813(q), 1813(u); 12 U.S.C. § 1867(c)(1).

37.     Pursuant to its statutory and regulatory authority, FDIC also has issued formal and informal guidance addressing state-chartered banks' relationships with their service providers in the exercise of their banking powers.

38.     The FDIC has issued guidance that establishes guideposts for banks that engage in third-party relationships to facilitate certain operations or make available products and services that are not offered by the institution itself.  FDIC, Guidance for Managing Third-Party Risk, FIL-08-044 (June 4, 2008);

39.     The FDIC has also addressed the incorporation of technology-enabled service providers like Elevate in connection with general bank services like those implicated here. *See* FDIC, Required Notification for Compliance with the Bank Service Company Act, FIL-49-99 (June 3, 1999) (noting that "an ever-increasing number of institutions are contracting with third parties to offer technology-related services"); FDIC, Bank Technology Bulletin on Outsourcing, FIL 50-2001 (June 4, 2001) (noting that the bulletin was offered as an informational resource on how to select service providers and draft contract terms when outsourcing for technology products and services).

40.     An FDIC forum in May of 2018 focused specifically on "emerging technologies that are transforming banking operations, the impact of emerging technologies on retail banking, including new and innovative delivery channels, enhanced customer experiences, economic inclusion; and consumer financial data access."  FDIC Forum: Use of Technology in the Business of Banking, FIL-15-2018 (April 5, 2018).

41.     The FDIC also issued in February 2020 a guide specifically for third party technology service providers like Elevate to "encourage innovation that meets consumer demand." FDIC, Conducting Business With Banks: A Guide for Fintechs and Third Parties (February 2020).

The FDIC noted that this guide is the first in a series of new resources tailored specifically for digital-first technology providers that partner with banks. *Id.*

42.    The FDIC similarly has focused on the use of technology in connection with lending programs. That guidance highlights how banks' use of third-party service providers like Elevate may "enable institutions to lower costs of delivering credit products and to achieve strategic or profitability goals." FDIC, Proposed Examination Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016).

43.    Notably, the prudential regulators – including the FDIC – released in May 2020 long-awaited Interagency Lending Principles for Offering Responsible Small-Dollar Loans, which encompasses the loan programs at issue in this matter. FDIC, Interagency Lending Principles for Offering Responsible Small-Dollar Loans, FIL-58-2020 (May 20, 2020) ("Small Dollar Guidance").

44.    The Small Dollar guidance encourages various financial institutions to offer responsible small-dollar loans to help customers meet their ongoing credit needs. *Id.* at 1-2. It further notes that small dollar lending programs offered by banks "could include effectively managed deployment of innovative technology or processes for customers who may not meet a financial institution's traditional underwriting standards" and "can be implemented through effectively managed third-party relationships." *Id.* These programs can also employ technologies, and automation in the underwriting process to lower the cost of providing loans. *Id.*

## **BASIS FOR REMOVAL JURISDICTION**

45.    This is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and is one that may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1446.

46.     The FDIC's regulation of state-chartered banks, including with respect to interest rates, service providers and technological innovations implicated in this action, intends to ensure the soundness and stability of the nation's banking system.  A fundamental part of maintaining that soundness and stability resides in the exportation of interest rates for loans originated by state-chartered banks, including in loans that they assign or sell.  Exportation of interest rates is necessary to maintain adequate levels of capital and liquidity, to diversify risk, and to help make funds available for lending.  The ability to assign loans with these exportable rates serves these same systemic goals as well.

47.     The Complaint in this action perceptibly impacts the established federal regulatory scheme and the structure it implements.  Under this regulatory scheme, the state-chartered banks loans are lawful, the sale and assignment of those loans is lawful, and the state-chartered banks' relationships with Elevate are lawful.  The service provider role undertaken by Elevate likewise is expressly contemplated by the regulatory scheme and there is nothing unlawful about Elevate's performance of that role.

48.     The Complaint also directly raises the question of whether state law usury claims can be brought against a service provider like Elevate, consistent with existing FDIC oversight and regulation.

49.     In both these respects, the Complaint requires resolution of how the federal regulatory scheme can be given its intended effect in the face of its claims.  Issues of federal law are, accordingly, embedded in the resolution of this controversy, as are substantial federal policies implemented by the regulatory scheme and the oversight it contemplates.

50.     Federal question jurisdiction exists when an action presents a claim "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331. Under the well- pleaded

complaint rule, a claim ordinarily arises under federal law only when a federal question is presented on the face of the complaint. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). There are, however, exceptions to the well-pleaded complaint rule including with respect to state law claims that (i) are completely preempted or (ii) that implicate significant federal issues and invoke serious federal interests. These exceptions support federal question removal in this case.

51.     **First**, the Complaint's respective Counts raise the question of whether state usury law claims or claims based on state usury law can be brought against a service provider like Elevate consistent with federal statutes and FDIC oversight and regulation. Because the charging and exportation of the interest rates by FinWise and Republic is expressly authorized by Section 1831d, the Complaint's claims are completely preempted. Under controlling law, removal is authorized for this reason.

52.     **Second**, the Complaint's Counts also require construction and interpretation of the federal regulatory scheme, including with respect to Elevate's lawful role as a service provider. The statutes, regulations and guidance that implement that federal regulatory scheme must be considered and construed to determine the viability of the claims as alleged. Issues of federal law and substantial federal policies accordingly are embedded in the resolution of this controversy. Under controlling law, removal is authorized for this reason as well.

## COMPLETE PREEMPTION

### Section 27 of the Federal Deposit Insurance Act Preempts State Usury Claims

53.     This action is removable because it falls under the "complete preemption" exception to the well-pleaded complaint rule. The complete preemption doctrine allows for the removal of cases in which the "pre-emptive force of [federal law] is so extraordinary that it

converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar*, 482 U.S. at 393 (citation omitted).

54.     It is undisputed that FinWise is a federally-insured, state-chartered bank existing under the laws of Utah and Republic is a federally-insured, state-chartered bank existing under the laws of Kentucky.[1]   Complaint ¶ 10.   As such, loans made by FinWise and Republic are subject to the provisions of Section 27 of the Federal Deposit Insurance Act ("FDIA" or "Section 27"), 12 U.S.C. § 1831d.

55.     State-chartered banks subject to the FDIA enjoy the same preemption that national banks are entitled to under the National Bank Act ("NBA").

56.     The Supreme Court has held that §§ 85 and 86 of the NBA completely preempt state law usury claims against national banks. *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003).   In particular, the Court stated that those sections provide the "exclusive cause of action" for usury claims against national banks, and thus there is "no such thing as a state-law claim of usury against a national bank." 539 U.S. at 11.   As a result, the Court found that state law claims were completely preempted and removal was proper. *Id.*

57.     Section 27, in turn, was drafted by Congress with the express purpose of allowing state chartered banks to lend at rates set by the state where the bank is located, and accomplishes that purpose by mirroring the language of Sections 85 and 86 of the NBA. *Greenwood Tr. Co. v. Com. of Mass.*, 971 F.2d 818, 827 (1st Cir. 1992) (surveying Congressional Record and text to

---

[1] In determining whether a complaint includes any claims that are completely preempted, a "court may 'look beyond the face of the complaint to determine whether a plaintiff has artfully pleaded his suit so as to couch a federal claim in terms of state law.'" *Pryzbowski v. U.S. Healthcare, Inc.,* 245 F.3d 266, 274 (3d Cir. 2001) (quoting *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1488 (7th Cir. 1996)); *see Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 399-402 (3d Cir. 2004), (considering evidence extrinsic to the complaint to determine whether complete preemption applied and created federal jurisdiction); *Palmer v. Kraft Foods Global, Inc.*, 2014 U.S. Dist. LEXIS 10700, *9-15 (E.D. Pa. Jan. 29, 2014) (same).

hold that Section 27 must be read "*in pari materia*" with the [NBA], and holding that section 27 "derails any state-sponsored attempt to regulate the maximum interest chargeable by a federal insured bank chartered in another state").

58.    Section 27 therefore gives state banks the right to charge a federally-prescribed rate on loans that may exceed state usury caps and to "export" interest rates available in states where the banks are located.  12 U.S.C 1831d(a); FDIC Advisory Opinion, Relationship of State Usury Preemption Laws, FDIC-88-45 (June 29, 1988).

59.    Section 27's plain language makes clear that Congress intended to "prevent discrimination against state-chartered" by allowing state-chartered banks to fully benefit from the interest rates allowed in the states where they are located and place them on competitive footing with national banks.  12 U.S.C 1831d(a).  The ability to charge prevailing rates from the state where banks are located assists those banks in making loans that are economically viable and helps safeguard their stability.

60.    Like Section 86, Section 27 creates the exclusive cause of action for actions challenging allegedly usurious rate of interest in loans made by a state bank.  12 U.S.C 1831d(b).

61.    Because Section 27 mirrors and applies the protections of §§ 85 and 86 of the NBA to state-chartered, federally insured banks, the complete preemption analysis from *Beneficial National Bank* is equally applicable to claims arising under Section 27.  *See Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014) (upholding the exportation of interest rates after noting the identical language between Section 27 and §§ 85 and 86 of the NBA).

## Involvement of Elevate as a Service Provider Does Not Impact the Complete Preemption Analysis

62.    The state-chartered banks' use of Elevate as a service provider is appropriate, lawful and does not impact the complete preemption of the state usury claims alleged in the

complaint.  Courts have long held that national and state-chartered banks may use service providers to facilitate bank services while retaining the right to enjoy preemption of state law usury claims.

63.     For example, in the seminal case of *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, the plaintiff brought a lawsuit against two companies that did not "extend credit or receive interest," but instead received fees from a nationally chartered bank for "**solicit[ing]** prospective cardholders" for loans made by the bank.  439 U.S. 299, 304-05 (1978) (emphasis added).  The plaintiff in *Marquette* sought to enjoin the two non-bank defendants from "**engaging in [the] solicitation** of residents of the State of Minnesota" in violation of the usury laws of Minnesota—an injunction that was entered by the Minnesota state court.  *Id.* at 306 (emphasis added).  The Supreme Court of Minnesota reversed the injunction, and upon grant of certiorari by the Supreme Court of the United States, the decision of the Minnesota Supreme Court was affirmed.  *Id.*at 306-07.

64.     In holding that the NBA permitted the making of loans at interest rates of the bank's home state of Nebraska, the Supreme Court noted that "the **federal question** presented for decision" was whether the NBA applied to the operation of the lending program by the non-bank defendants.  *Id.*at 306-07 (emphasis added).  The NBA applied, and permitted the bank and its partners to offer the loans.  *Id.* at 313.

65.     Other courts have followed these cases and recognized that banks may properly utilize third parties to assist them in the operation of their lending business without losing the protections of the NBA.  For example, the Fourth Circuit in *Cades v. H & R Block, Inc.*, held that usury claims based upon the "solicitation of out of state consumers by agents of a national bank" are governed by Section 85 of the NBA.  43 F.3d 869, 873–74 (4th Cir. 1994).

66.     In *Krispin v. May Department Stores Company*, the Eighth Circuit held that consumers' state law usury claims against a third party arising out of loans originated by a national bank were completely preempted under the NBA notwithstanding the lack of a claim against the national bank.  218 F.3d 919, 922-24 (8th Cir. 2000).  The First Circuit has also recognized, "the [NBA] explicitly states that a national bank may use 'duly authorized officers or agents' to exercise its incidental powers." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532 (1st Cir. 2007) (quoting 12 U.S.C. § 24, Seventh).

67.     Consistent with the statutory language, intent and effect of Section 27 – which mirrors corollary provisions under the NBA – courts have also held that state-chartered banks, like national banks, may use service providers without impacting the application of federal preemption. *See Sawyer*, 23 F. Supp. 3d at 1368-69 (applying complete preemption to claims involving agents of state-chartered bank); *State Farm Bank v. Reardon*, 539 F.3d 336, 346 (6th Cir. 2008) ("federal law provides [a state-chartered bank] with the authority to delegate the task of soliciting and marketing its mortgage products to exclusive agents.").

### The Sale of Participation Interests in FinWise RISE and Republic Elastic Products Does Not Impact the Complete Preemption Analysis

68.     FinWise and Republic sell participation interests in their respective credit programs.  Complaint ¶¶ 41, 73.  Similar to the use of service providers, the state-chartered banks' sale of such interest does not impact in any way that they are the lenders on their respective loan products and are thus entitled to complete preemption.

69.     This conclusion was recently affirmed in final rules issues by the FDIC and the Office of the Comptroller of the Currency ("OCC"), the regulators with primary jurisdiction over state-chartered and national banks, respectively.  *See* FDIC Final Rule, Federal Interest Authority (June 25, 2020) (to be codified at 12 C.F.R. Part 331); Permissible Interest on Loans That Are

Sold, Assigned, or Otherwise Transferred, 85 Fed. Reg, 33530-33536 (June 2, 2020) (to be codified at 12 C.F.R. Part 7 and 160)Those rules make clear that state and national banks may make loans at the rates allowed by the state where the bank is located, the usury laws of the borrower's state is preempted, and those interest rates continue to remain valid and enforceable when those loans are later sold or assigned to non-banks. *Id.* These rules are consistent with banks' longstanding ability to fully participate in the secondary markets and ensure the proper functioning of the credit markets.

### The Claims in the Complaint are Completely Preempted

70.     The claims in the Complaint are subject to complete preemption because each count effectively challenges the amount of interest charged by the state-chartered banks. As noted above, the District's claims against Elevate all arise directly from, or relate to, the interest rates charged by FinWise and Republic on the loans and the services Elevate provided to FinWise and Republic in connection with the loans that the District describes as having been made "via FinWise and Republic" and elsewhere as having been "offered, provided, serviced, and advertised to District residents in conjunction with FinWise … and Republic." Complaint ¶¶ 10, 22.

71.     Specifically, each of the District's claims against Elevate is grounded wholly or substantially in the allegation that loans "offered" and "made via" FinWise and Republic were usurious under the laws of the District. Compl. at ¶ 87(a) (alleging that Elevate violated the CPPA by misrepresenting that the loans complied with District law), Compl. at ¶ 88(a) (alleging that Elevate violated the CPPA by failing to disclose or adequately disclose that the loans contained an APR in excess of District usury limits); Complaint at ¶¶ 91-92 (alleging that Elevate violated CPPA because the loans were "predatory" and "high-cost" loans); Complaint at ¶¶ 95-96 (alleging that Elevate violated the CPPA because the loans at issue violated District usury limits); and Complaint at ¶ 102 (alleging that despite the acknowledged roles of two state chartered banks in

connection with the loans, Elevate violated District regulations and the CPPA because it did not have a money lender license).

72.     Because the crux of the claims against Elevate directly challenges the interest rates charged by the state chartered banks, those claims are completely preempted.  *See, e.g. Krispin*, 218 F.3d at 924 (where bank originated loans are serviced by third party, "state law usury claims against the [third party] … implicate the N[ational] B[ank] A[ct], and the district court's decision to exercise removal jurisdiction based on the complete preemption doctrine was not error").

73.     To the extent the claims challenge the ability of Elevate to perform functions as a service provider to the state-chartered banks – who are, in fact, the lenders on the loans and charge legally permissible interest rates – without holding a money lender license from the District, they are also completely preempted.

74.     To the extent the claims are based on the state-chartered banks' sale of FinWise RISE and Republic Elastic credit products, recent and definitive guidance makes clear that complete preemption of state usury law is not impacted when loans are subsequently sold or assigned to non-bank entities.

75.     Accordingly, Plaintiff's claims against Elevate based on alleged violations of District usury laws and/or money lender license requirements support removal to federal court.

## SIGNIFICANT FEDERAL ISSUES

76.     As a further basis for removal under Sections 1331 and 1441(a), Elevate relies on the significant issues of federal law that must be resolved to determine the viability of the Complaint's state law claims.  The Supreme Court has long recognized that federal question jurisdiction also "lies[s] over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prods, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  In such cases, the

question of whether federal question jurisdiction exists depends on "whether the state-law claim necessarily [raises a] stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing a congressionally approved balance of federal and state judicial responsibilities." *Id*. at 308

77.     To assess the propriety of a removal based on "significant federal issues," the Supreme Court has articulated a four-part test (the "*Grable* test), whereby federal jurisdiction over a state law claim will lie if a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 313-14).

78.     If each of the elements in the *Grable* test is met, jurisdiction is proper because there is a "'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id*. (quoting *Grable*, 545 U.S. at 313-14).   This doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law." *Grable*, 545 U.S. at 312.

79.     This case plainly satisfies the first two requirements in the *Grable* test because the Complaint's allegations and requested relief necessarily raise disputed federal issues.

80.     A federal issue is "necessarily raised" here because an examination of the federal statutes, regulations and regulatory guidance applied to state-chartered banks and their service providers will be necessary to resolve the legal viability of the state law claims made in this case. Whether the fact pattern in this case is subject to the "true lender" analysis set forth in the Complaint and whether that analysis can displace the longstanding and robust federal regulatory

scheme that authorizes the exportation of interest rates and the use of service providers by state-chartered banks will involve, in the words of *Grable*, the "validity," "construction" and "effect" of federal laws.  *Grable*, 545 U.S. at 313.  Indeed, the federal law questions — given the statutes, regulations, and guidance — "overwhelmingly predominate" and removal is authorized for this reason.  *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010); *District of Columbia v. Group Hospitalization and Medical Servs., Inc.*, 576 F. Supp. 2d 51, 55 (D.D.C. 2008).

81.     There also is no doubt that the issues of federal law are disputed.  The parties have a fundamental disagreement over whether the federal statutory scheme that overlays this controversy has any impact for its resolution.  The Complaint alleges that the structure of the loan transactions and the interest rate they implement are unlawful under state law without regard to the federal statutes, regulations or guidance, or the FDIC's regulatory oversight.  Elevate maintains that the federal statutory scheme establishes that the challenged conduct is lawful and that state law cannot provide to the contrary.  This conflict meets the *Grable* test.

82.     The next two requirements under the *Grable* test are met as well.  The federal issues raised by the Complaint's allegations are substantial and they can properly be resolved by a federal court without departing from the federal-state balance envisioned by Congress.

83.     The strength of the federal interest is particularly profound.  Congress has undertaken to regulate state chartered banks by statute to facilitate the soundness of the banking system and avoid discrimination.  Pursuant to that mandate the FDIC has been empowered to oversee every aspect of the state-chartered banks' operations, including their relations with their service providers and the interest rates they charge.  This lawsuit attacks the core purposes of that regulatory scheme and the implications of that attack goes beyond the litigants to the federal regulation of state-chartered banks as a whole.  There is no colorable dispute that this controversy

meets *Grable's* standard.  *See Gilmore v. Weatherford*, 694 F.3d 1160, 1174 (10th Cir. 2012) ("As explained in *Grable*, a 'substantial federal issue' is one that 'indicat[es] a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'  Such an interest is present here."  (citation omitted)); *Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227, 1236 (10th Cir. 2006) ("We agree that the contested interpretation of the federal land-grant statutes as between these parties involves a substantial federal issue.").

84.    Moreover, given the strong federal interest reflected in the regulations and regulatory objectives and given the nature of the Complaint's collateral attack on the entire regulatory scheme, the disposition of the Complaint's state law claims "will ultimately have implications for the federal docket one way or the other."  As a result, the proper federal-state balance is preserved by allowing removal of this case to federal court.  *Board of Commissioners of the Southeast Louisiana Flood Protection Authority-East v. Tennessee Gas Pipeline Co.*, 850 F.3d 714, 725 (5th Cir. 2017).  As the state adjudications authorizing removal here will be limited only to those cases involving state chartered banks and the exportation of interest rates, such controversies already are a federal matter and the impact on state law usury claims will be minimal.  *See Bender*, 623 F.3d at 1131 ("microscopic" effect on federal-state division of labor satisfies the *Grable* test).

85.    In similar circumstances, courts in this Circuit and elsewhere have upheld removal in keeping with the commonsense notion that a federal court should decide substantial issues of federal law.  Start with *Grable*, in which the Supreme Court upheld removal jurisdiction where the parties' dispute involved a state quiet title action involving whether the Internal Revenue Service had given the plaintiff-landowner adequate notice of sale.  The Court found that the principal contested issue involved a substantial question of federal law, implicating a significant federal

interest — the meaning of a federal tax provision defining the requisite notice.  Because the meaning and import of the federal provision would be center stage, that issue, as the Court put it, "sensibly belongs in a federal court."  *Grable*, 545 U.S. at 314-19.  Indeed, in these circumstances, the Court observed "there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the state-law title claim."  *Id*. at 319-20.

86.     In *Board of Commissioners*, the Fifth Circuit arrived at the same conclusion in a state court action alleging that offshore oil and gas exploration caused damage to coastal lands. The court found that a right to relief, if established, would have to be drawn from federal law.  The resolution of the right to relief, moreover, had broad significance given its implications for the federal regulatory scheme in determining whether federal law provided the right.  Given the effect for the federal regulatory scheme, the federal issues were sufficient to justify federal jurisdiction. 850 F.3d at 723-25.

87.     In *Bender*, the D.C. Circuit upheld federal removal where a state court shareholder suit was brought against the directors and president of a federal stock savings association for mishandling the election of board seats.  Applying the *Grable* test, the D.C. Circuit held that federal questions overwhelmingly predominated because the agreements in the controversy were "creatures of federal laws" implemented by a federal regulatory scheme.  623 F.3d at 1330-31. The parties' legal duties likewise could not be determined without a proper interpretation of federal law or considering the role of a federal agency—the Office of Thrift Supervision.  The analysis supporting removal in *Bender* plainly could have been written with this case in mind.

88.     Similarly, in *Hornish v. King County*, 899 F.3d 680 (9th Cir. 2018), landowners brought an action against a county involving property rights in a rail corridor.  The principal issue concerned the meaning and import of the National Trails System Act on the scope of a railroad

easement.  Plainly, the state court action involved a serious federal interest where the vindication

of the right turned on the construction of federal law.  The Trails System Act also evoked and

implemented a congressional effort to convert unused rights of way into recreational trials.  That

record again dictated, as it did *Grable* and the other cases, that "an important issue of federal law

that sensibly belongs in a Federal Court."  *Id*. at 690-91 (quoting *Grable*, 564 U.S. at 315).

89.     Finally, similar reasoning was employed by this Court in *District of Columbia*,

where an action was filed in state court charging a non-profit charitable corporation with willfully

violating its federal charter and misappropriating assets.  This conduct was alleged to have

breached the corporation's service mission and charitable trust obligations.  The critical contested

issue on resolving these claims revolved around the proper interpretation of the charter, an

inherently federal issue with substantial consequences.  The federal government also had a strong

interest in how obligations were interpreted under a federal charter.  Given the primacy and

consequences of the federal interpretation issues, sound judgment and division of labor led to the

conclusion that the dispute belonged in federal court.  576 F. Supp. 2d at 55-57.

90.     The parallels between these cases and this case are direct and meaningful in terms

of allowing removal.  Here, federal statutes including the FDIA and the BSCA, along with federal

regulations and regulatory guidance, permeate the controversy and determining their meaning and

import is pivotal in resolving the controversy raised in the Complaint.  It is not debatable that the

regulatory structure, implemented, monitored, and over-seen by the FDIC, expresses substantial

federal policy and matters of serious federal concern.  This is particularly true with respect to

interest rates, and their exportation, and to utilization of service providers by state-chartered banks.

These construction issues involving federal statutes, regulations and regulatory guidance sensibly

belong in federal court and will not overwhelm the federal docket or unduly disrupt state

prosecution of the great majority of usury claims.  Removal thus is appropriate given the federal issues embedded in resolving the issues presented.

## <u>SUPPLEMENTAL JURISDICTION UNDER 28 U.S.C. § 1367</u>

91.     This Court should exercise supplemental jurisdiction under 28 U.S.C. § 1367 over any claims that are not independently removable.  *See* 28 U.S.C. § 1367(a).

## <u>NOTICE TO STATE COURT AND PLAINTIFF</u>

92.     Counsel for Elevate certifies that pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal will be filed with the Clerk of the Superior Court of the District Columbia, and served on Plaintiff promptly.

Dated:  July 2, 2020                          Respectfully submitted,

    */s/  A. Scott Bolden*
A. Scott Bolden (D.C. Bar No. 428758)
Maria B. Earley (D.C. Bar No. 484294)
REED SMITH LLP
1301 K Street, N.W., Suite 1000 – East Tower
Washington, DC 20005
Phone: (202) 414-9200
Facsimile: (202) 414-9299
abolden@reedsmith.com
mearley@reedsmith.com

James C. Martin (*Pro hac motion forthcoming*)
REED SMITH LLP
Reed Smith Centre, 225 Fifth Avenue
Pittsburgh, PA 15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
jcmartin@reedsmith.com

Travis A. Sabalewski (*Pro hac motion forthcoming*)
REED SMITH LLP
Riverfront Plaza - West Tower
901 East Byrd Street, Suite 1900
Richmond, VA 23219-4068
Telephone:  (804) 344-3400
Facsimile:  (804) 344-3410
tsabalewski@reedsmith.com
*Counsel for the Defendant, Elevate Credit, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by electronic mail and electronically filed with the Clerk of Court by using the CM/ECF system this 2nd day of July 2020, which will send a notice of electronic filing to all parties or counsel of record registered with the CM/ECF system as identified on the service list below.

> Wendy J. Weinberg
> Office of The Attorney General for the District of Columbia
> 441 4th Street NW, Suite #1100
> Washington, DC  20001
> *Counsel for the District of Columbia*

> */s/  A. Scott Bolden*
> A. Scott Bolden (D.C. Bar No. 428758)