**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DISTRICT OF COLUMBIA<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ELEVATE CREDIT, INC.<br><br>　　　　　　Defendant. | Civ. Action No. 20-1809 (EGS) |

## <u>MEMORANDUM OPINION</u>

The District of Columbia ("Plaintiff" or "the District")
filed this consumer protection enforcement action against
Elevate Credit, Inc. ("Defendant" or "Elevate") in the Superior
Court of the District of Columbia ("Superior Court") for alleged
violations of the District of Columbia Consumer Protection Act
("CPPA"), D.C. Code §§ 28-3901 *et seq.* The District alleges that
Elevate, an unlicensed online money lender, operates what is
commonly referred to as a "rent-a-bank" scheme whereby a lender
markets and sells high-interest loans to consumers in one state,
where interest rate caps are low, using a partnership with a
bank chartered in a different state, where interest rate caps
are much higher, in an attempt to skirt the lower interest rate
caps in the state where the loans are being made. This suit
seeks to prevent Elevate from using this alleged rent-a-bank
arrangement as an end run around the District's consumer
protection laws. The District alleges that Elevate is the "true

lender" of loans it markets and sells to District residents that contain interest rates of up to 149% for one of its products and 251% for another of its products—well in excess of the 24% and 6% caps in the District's usury statutes—and that Elevate misrepresents material characteristics of these loans when marketing them to consumers, all in violation of the CPPA. *See generally* Compl., ECF No. 1-2.

Elevate removed the case to this Court, asserting that jurisdiction exists here pursuant to 28 U.S.C. §§ 1331 and 1441 because the District's claims: (1) are completely preempted by federal banking law; and (2) they implicate significant federal issues and invoke serious federal interests. Notice of Removal, ECF No. 1 at 12.[1] Pending before the Court is the District's Motion to Remand to the Superior Court for lack of subject matter jurisdiction. *See* Pl.'s Mot. Remand ("Pl.'s Mot."), ECF No. 15. Upon careful consideration of the motion, opposition, and reply thereto, the notice of supplemental authority and the response thereto, the applicable law, and the entire record herein, Plaintiff's Motion to Remand is **GRANTED**.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

# I. Background

## 1. Factual Background

The following facts—drawn from the Complaint and documents incorporated by reference therein—are assumed to be true. *See Colon v. Ashby*, 314 F. Supp. 3d 116, 120 (D.D.C. 2018) (quoting *Walter E. Campbell Co. v. Hartford Fin. Servs. Grp., Inc.*, 48 F. Supp. 3d 53, 55 (D.D.C. 2014) ("When assessing a remand motion, . . . the court 'must assume all of the facts set forth by plaintiff to be true and resolve all uncertainties as to state substantive law in favor of the plaintiff.'").

Elevate, a Delaware corporation, is an "online lender that operates through several websites . . . to provide predatory, high-interest, short-term loans to consumers that it describes as individuals 'with little to no savings, urgent credit needs and limited options.'" Compl., ECF No. 1-2 ¶¶ 1, 10. Elevate describes its business model in its 2019 annual report filed with the Securities and Exchange Commission ("2019 10-K") as "provid[ing] convenient, competitively priced financial solutions to our customers, who are not well-served by either banks or legacy non-prime lenders, by using our advanced technology platform and proprietary risk analytics." *Id.* ¶ 4. Elevate has "offered, provided, serviced, and advertised loans to District residents in conjunction with FinWise Bank ('FinWise'), a Utah-chartered bank, for its Rise brand, and

Republic Bank & Trust Company ('Republic'), a Kentucky-chartered bank, for its Elastic brand." *Id.* ¶ 10. Elevate's Rise brand is an installment loan that offers "fast approval for loans between $500 and $5,000," *id.* ¶ 24; and its Elastic brand is "a line of credit in amounts between $500 and $4,500," *id.* ¶ 49. Elevate has provided at least 871 Rise loans and 1,680 Elastic loans to District consumers. *Id.* ¶ 15. The District alleges Elevate deceptively markets these loans and charges illegal interest rates—between 99% and 149% on its Rise loans and between 129% and 251% on its Elastic loans, "well in excess of the District's usury caps." *Id.* ¶¶ 23, 48.

According to the District, Elevate is the true lender of the Rise and Elastic loans. *Id.* ¶¶ 36-47, 68-79. The District alleges that Elevate provides the marketing for the Rise and Elastic products "through direct mail, E-mails, and via banner ads on the Internet that were either accessible to or directed at District residents." *Id.* ¶¶ 17, 18. Elevate "prepares product offerings and associated marketing materials; develops and places internet, print media, radio and television advertising; designs and develops websites; and delivers all notices and disclosures to consumers." *Id.* ¶¶ 25, 52. Elevate is solely responsible for "all costs and expenses associated with advertising and developing promotional materials" for Rise and Elastic loans. *Id.* ¶¶ 26, 53.

4

The District also alleges that Elevate "has the predominant economic interest in the loans it provides to District consumers via FinWise and Republic." *Id.* ¶ 22. For the Rise loans, the District contends Elevate funds the loans, reaps the profits of good loans, takes on the risk of bad loans, and acts as the servicer of the loans. *Id.* ¶ 36. The District contends Elevate "in essence rents FinWise to provide the loan," but "it is Elevate that directs and controls the funding of the loan." *Id.* ¶ 37. Elevate "funds Rise loans through its captive credit financing relationship with Victory Park Management, LLC ('VPC')," which provides debt financing for Elevate, without which Elevate would "have to secure other sources of debt financing or potentially reduce loan originations." *Id.* ¶ 38. Elevate also "reaps most of the profits" from the Rise brand loans. *Id.* ¶ 39. In 2019, Elevate's revenue from the Rise brand loans totaled approximately $390,354,000. *Id.* ¶ 40. Elevate EE SPV ("EE SPV")—"a Cayman Islands special purpose vehicle that operates for the financial benefit of Elevate"—has allegedly purchased a 96% interest in the receivables for the Rise loans, including the principal and interest due on the loans. *Id.* ¶ 41. The District contends that EE SPV is thus the "legal and equitable owner of the receivables from the loans," and these receivables generate income for Elevate, "the primary beneficiary of EE SPV." *Id*. Indeed, Elevate's financial

statements include "revenue, losses and loans receivable related to the 96% of Rise installment loans originated by FinWise Bank and sold to EE SPV." *Id.* ¶ 42. Elevate also "takes the risk of bad loans." *Id.* ¶ 44. Specifically, "Elevate provides credit protections to EE SPV against Rise loan losses," which "places the risk of losses on Elevate." *Id.* ¶ 45. Furthermore, "FinWise's interests are protected in its agreement with EE SPV by a requirement that EE SPV maintain cash collateral in a FinWise account in specified amounts to secure its obligations to purchase the loans." *Id.* ¶ 46.

Similarly, for the Elastic brand loans, the District alleges Elevate reaps the profits of good loans and takes the risk of bad loans. *Id.* ¶ 68. Again, the District contends "Elevate, in essence[,] rents Republic to originate the loans that it ultimately controls and profits from through Elevate SPV ('ESPV')." *Id.* ¶ 69. According to the District, Elevate's 2019 10-K explains that Elevate needs a bank (*i.e.*, Republic) to provide access to the Automated Clearing House ("ACH") system to deposit the loans into consumers' accounts and to withdraw the repayments, and "if these banks cease to provide ACH processing services or are not allowed to do so, [Elevate] would have to materially alter, or possibly discontinue, some or all of [its] business if alternative ACH processors or other payment mechanisms are not available." *Id.* ¶¶ 70-71. Elevate also

profits from the Elastic loans, having brought in approximately $248,518,000 in revenue in 2019 from those loans. *Id.* ¶ 72. ESPV—another Cayman Islands special purpose vehicle "that operates for the financial benefit of Elevate"—has allegedly purchased a 90% interest in the receivables for the Elastic brand loans, including the principal and interest due on the loans. *Id.* ¶ 73. ESPV is therefore, according to the District, the legal and equitable owner of the receivables of the loans, and those receivables generate income for Elevate. *Id.* As was true with respect to the Rise loans, Elevate's financial statements include "revenue, losses and loans receivable related to the 90% of Elastic loans originated by Republic and sold to ESPV." *Id.* ¶ 75. Elevate also "takes the risk of bad Elastic loans." *Id.* ¶ 76. "Elevate provides credit protection to ESPV against Elastic loan losses," meaning "Elevate holds the risk for loan losses." *Id.* ¶ 77. "Republic's interests are protected in its agreement with ESPV by a requirement that ESPV maintain cash collateral in a Republic account in specified amounts to secure its obligations to purchase the loans." *Id.* ¶ 78.

The District also alleges that Elevate, "through one of its subsidiaries, also acts as the servicer for" the Rise and Elastic loans, which includes reconciling the accounts, posting payments and other credits to the accounts, and providing periodic billing statements. *Id.* ¶¶ 47, 79. In addition, Elevate

has "either registered trademarks or has pending applications in the United States for the marks Rise and Elastic" and "holds the intellectual property rights to its proprietary analytics, predictive underwriting models, and software systems," and it "provides the analytics, software, and underwriting models to FinWise and Republic for the provision of the Rise and Elastic loans." *Id.* ¶¶ 20-21.

### 2. The District's Claims Under the District of Columbia Consumer Protection Procedures Act

The District alleges that Elevate violated the CPPA by: (1) providing high-interest loans to residents of the District with interest rates that exceed the permissible amount under District law; (2) not registering as a money lender in the District; and (3) misrepresenting material characteristics of loans when marketing them to consumers. *See* Compl., ECF No. 1-2. As relevant here, the CPPA: (1) establishes a right to truthful information from merchants about consumer goods; (2) prohibits any person from engaging in unfair trade practices; (3) prohibits any person from violating the District's usury laws; and (4) prohibits any person from engaging in the business of lending money without obtaining a license as a money lender. *Id.* at 12-16.

The Complaint contains the following claims against Elevate for violations of Section 28-3904 of the CPPA: (1)

Misrepresentations and Omissions, in violation of D.C. Code §§ 28-3904(b), (e), (f), and (f-1); (2) Unfair and Unconscionable Practices, in violation of D.C. Code §§ 28-3904 and 3904(r); (3) Violations of the District Usury Laws, in violation of D.C. Code §§ 28-3904(ff); and (4) Violations of the District of Columbia Municipal Regulation ("DCMR"), in violation of D.C. Code § 28-3904(dd). *Id.* As relevant to Count III, it is a violation of Chapter 33 of the D.C. Code—the District's usury laws—for a licensed money lender to contract for an interest rate above 24%, or for a licensed money lender to charge an interest rate above 6% if no interest rate is expressed in the contract. *See* 28-3301(a), 28-3308(a), and 28-3302(a). As relevant to Count IV, it is a violation of the DCMR to engage in the business of loaning money in the District without obtaining a license as a money lender. *See* 16 DCMR §§ 201.1 and 200.4.

### 3. Elevate's Assertions in Support of Removal Under Section 27 of the Federal Deposit Insurance Act

Elevate asserts that the Complaint "challenges interest rates lawfully charged by state-chartered banks under a federal statutory and regulatory scheme administered by the [FDIC]." *See* Notice of Removal, ECF No. 1 at 1. Central to the removal dispute is Elevate's contention that the state-chartered banks, FinWise and Republic, are responsible for the Rise and Elastic loans and interest rates, and Elevate's only role is as a

servicer provider. *Id.* ¶¶ 15-30. Unlike non-bank entities like Elevate, state-chartered banks are "regulated under a statutory structure enacted by Congress and administered by the FDIC." *Id.* ¶ 17.

Two federal statutes establish the maximum amounts of interest that national and state-chartered banks may charge their customers: (1) Section 85 the National Bank Act ("NBA"), 12 U.S.C. § 85, for national banks; and (2) Section 27 the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. §§ 1831d, for state-chartered banks.[2]

The NBA was created during the Civil War era to facilitate a national banking system, and it "constitutes a complete system for the establishment and government of national banks." *See* 10 Am. Jur. 2d *Banks and Financial Institutions* § 119. Section 85 of the NBA "authoriz[es] national banks to charge or receive interest on loans and discounts at the rate allowed by the laws of the state, territory, or district in which the bank is located, or at a rate based on the rate in effect at the Federal Reserve bank in the Federal Reserve district where the national

_____

[2] Section 27 was added to the FDIA in 1980 by Section 521 of the Depository Institutions Deregulation and Monetary Control Act ("DIDA" or "DIDMCA"), Pub. L. No. 96-221, 94 Stat. 132 (1980). Some decisions cited in this Memorandum Opinion refer to the relevant statutory provision as Section 521 of DIDA or DIDMCA, while others refer to it as Section 27 of the FDIA. The Court uses "Section 27," "Section 27 of the FDIA," or "12 U.S.C. § 1831d" in this Memorandum Opinion.

bank is located." *Id.* § 983. The Supreme Court has explained that Section 85 "sets forth the substantive limits on the rates of interest that national banks may charge," and "if . . . the interest that [a] bank charge[s] . . . [does] not violate § 85 limits, the statute unquestionably pre-empts any common-law or [state] statutory rule that would treat those rates as usurious." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 9 (2003). Section 85 works in parallel with Section 86, which "sets forth the elements of a usury claim against a national bank, provides for a 2-year statute of limitations for such a claim, and prescribes the remedies available to borrowers who are charged higher rates and the procedures governing such a claim." *Id.*

Before Congress passed Section 27 of the FDIA in 1980, national banks held a favored lending position vis-à-vis state-chartered banks because the NBA preempted state law to allow national banks to charge as much or more interest than the state-chartered banks against which they competed. *See Greenwood Trust Co. v. Massachusetts*, 971 F. 2d 818, 826 (1st Cir. 1992) (explaining that "state institutions were at an almost insuperable competitive disadvantage" to national banks during the credit crunch of the late 1970s when interest rates were soaring but state institutions were constrained in the interest they could charge by state usury laws in ways national banks

were not). To remedy that disparity, Congress passed Section 27 for the express purpose of "prevent[ing] discrimination against State-chartered insured depository institutions, including insured savings bank." *See 12* U.S.C. § 1831d.

Section 27 of the FDIA provides as follows:

> In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a). What Section 27 does is allow state-chartered banks to charge the maximum interest rates allowed in their home states or a prescribed federal interest rate, even to borrowers in states that set lower interest rate caps. And like Section 86 of the NBA, Section 27 subsection (b) provides for

the remedies available against a state-chartered bank charging excessive interest rates. *See* 12 U.S.C. §1831d(b).

### 4. Elevate's Additional Assertions in Support of Removal

Elevate also asserts that the Complaint "challenges Elevate's lawful role as a service provider for state-chartered banks, a role also regulated by the FDIC." *See* Notice of Removal, ECF No. 1 at 1. Elevate asserts that the FDIC requires state-chartered banks to "monitor and oversee Elevate in its role as a service provider." *Id.* ¶ 34 (citing 12 U.S.C. § 1802(d)(1); 12 C.F.R. § 337.12(a)). Elevate also contends that the Bank Service Company Act "allows the state-chartered banks to engage service providers like Elevate, by contract or otherwise, to perform bank-related function on behalf of the bank," and service providers are "subject to regulation and examination by the FDIC as if the services were provided by the bank itself." *Id.* ¶ 35 (citing 12 U.S.C. § 1867(c)). Elevate characterizes the FDIC as "establish[ing] the requirements and responsibilities concerning the state-charted banks' risk-management procedures and due diligence in monitoring their third party service providers," and "hold[ing] the state-chartered banks responsible for their relationships with third party providers, including service providers like Elevate." *Id.* ¶ 36 (citing 12 U.S.C. §§ 1813(q), 1813 (u); 12 U.S.C. § 1867(c)(1)). Elevate further assets that the FDIC has issued

guidance that addresses a number of the actions at issue in the District's complaint. *See id.* ¶¶ 38-44.

Accordingly, Elevate removed this case to federal court on the basis that jurisdiction exists here based on "the preemptive effect of Section 27 . . . , on the one hand, and the need to interpret FDIC statutes, regulations, and guidance, on the other." Def.'s Opp'n, ECF No. 23 at 2.

## II. Legal Standard

A civil action may be removed from state court to a federal district court only if the federal district court has original subject-matter jurisdiction over the case. 28 U.S.C. § 1441(a). The Superior Court is considered a state court for removal purposes. *Id.* § 1451(a). "When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case . . . , and the court's order remanding the case to the state court whence it came 'is not reviewable on appeal or otherwise.'" *Republic of Venezuela v. Philip Morris, Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c); quoting *id.* § 1447(d)). "Because of the significant federalism concerns involved, this Court strictly construes the scope of its removal jurisdiction." *Downey v. Ambassador Dev., LLC*, 568 F. Supp. 2d 28, 30 (D.D.C. 2008). "The party seeking removal of

an action bears the burden of proving that jurisdiction exists in federal court." *Id.*

The subject matter jurisdiction of federal district courts is limited and is set forth generally at 28 U.S.C. §§ 1331 and 1332. Section 1331 confers jurisdiction on district courts over all civil actions arising under the Constitution, laws or treaties of the United States, or where the controversy presents a "federal question." 28 U.S.C. § 1331. Absent diversity of citizenship, federal question jurisdiction is required to establish that the case could have originally been filed in federal court. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id.* "[I]t is now settled law that a case may *not* be removed to federal court on the basis of a federal defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393.

There are two situations in which federal question jurisdiction may exist even where, as here, a complaint alleges only state law claims. First, Congress may "so completely pre-

empt a particular area that any civil complaint raising [a] select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). This doctrine of "complete preemption" is an "independent corollary" to the well-pleaded complaint rule that "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar Inc.*, 482 U.S. at 392. "Once an area of state law has been completely preempted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* Second, in a "special and small category of cases[,] . . . federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)).

## III. Analysis

Elevate, which bears the burden of showing the Court has jurisdiction, maintains that removal to federal court is proper in this case because: (1) Section 27 of the FDIA completely preempts state law claims involving loans originated by a state-chartered bank; and (2) the significant federal issues doctrine

provides an independent ground for removal because federal law must be interpreted and considered to determine the validity of the District's claims. *See* Def.'s Opp'n, ECF No. 23 at 6-23.

The Court disagrees, and, for the reasons set forth below, concludes that this Court does not have jurisdiction to hear this case. The case shall be remanded to the Superior Court.

## A. The FDIA Does Not Completely Preempt the District's State Law Claims Against Elevate, a Non-Bank Entity

Complete preemption exists only when a federal statute's "pre-emptive force is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" (quoting *Metro. Life Ins. Co.*, 481 U.S. at 65). It is "not . . . a crude measure of the breadth of the preemption (in the ordinary sense) . . . but rather . . . a description of the specific situation in which a federal law . . . substitutes a federal cause of action for a state cause of action, thereby manifesting Congress's intent to permit removal." *Schmeling v. NORDAM*, 97 F.3d 1336, 1339 (10th Cir. 1996).

The Supreme Court has found only three statutes have the requisite extraordinary preemptive force to support complete preemption: (1) Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, *see Avco Corp. v. Machinists*, 390 U.S. 557 (1968); (2) the Employee Retirement Income Security Act of 1947,

29 U.S.C. § 1001 *et seq.*, *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987); and, as relevant here, (3) Sections 85 and 86 of the NBA, 12 U.S.C. §§ 85-86, *see Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003). In *Beneficial*, the Supreme Court held that Sections 85 and 86 of the NBA provide the exclusive cause of action for usury claims against national banks, and there is no such thing as a state law claim of usury against a national bank; thus, the NBA completely preempts such state law claims. 539 U.S. at 11.

Elevate argues that just as Sections 85 and 86 of the NBA provide the exclusive cause of action for usury claims against national banks, Section 27 of the FDIA provides the exclusive cause of action for usury claims against state-chartered banks. *See* Notice of Removal, ECF No. 1 ¶ 60. Section 85 of the NBA and Section 27 of the FDIA allow national and state-chartered banks, respectively, to charge interest at rates set by the banks' home states, even if those rates are illegal in the states in which the loans are made. *See* 12 U.S.C. §§ 85-86; 12 U.S.C. § 1831d. Elevate reasons that because Section 27 was "enacted to create parity and fair competition between state-chartered and national banks" and it "mirror[s] the language of Sections 85 and 86," the Supreme Court's complete preemption analysis in *Beneficial* is "equally applicable to claims against federally-insured, state-chartered banks arising under Section 27." Def.'s Opp'n,

ECF No. 23 at 14-15. Therefore, because the usury claims in the District's complaint relate to loans originated by FinWise, a Utah-chartered bank, and Republic, a Kentucky-chartered bank, Elevate argues Section 27 provides the exclusive cause of action for those claims. *See id.* at 13.

For the reasons set forth below, the Court concludes that even if Section 27 of the FDIA completely preempts state law usury claims against state-chartered banks, it does not completely preempt the District's claims against Elevate, a non-bank entity. Accordingly, Section 27 does not provide a basis for removal of this action to federal court.

## 1. If Section 27 Completely Preempts State Law Usury Claims, It Only Applies to Claims Against State-Chartered Banks

The Supreme Court has not addressed whether Congress intended Section 27 of the FDIA to completely preempt state law usury claims against state-chartered banks insured by the FDIC, as Sections 85 and 86 of the NBA do for state law usury claims against national banks. To date the Supreme Court has chosen not to address this issue, *see Vaden v. Discover Bank*, 556 U.S. 49, 56 n.4 (2009) (citing *Beneficial* by way of comparison) ("Our disposition of this case makes it unnecessary to take up the question of § 27(a)'s preemptive force generally or in the particular context of Discover's finance charges. We therefore express no opinion on those issues."); and a split currently

exists among circuit courts that have addressed the issue,
*compare In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir.
2005) (holding complete preemption exists with respect to
Section 27, and state law usury claims against state-chartered
bank were appropriately removed to federal court) *and Discover
Bank v. Vaden*, 489 F.3d 594, 606-07 (4th Cir. 2007) (same),
*rev'd on other grounds*, 556 U.S. 49 (2009)*, with Thomas v. U.S.
Bank N.A.*, 575 F.3d 794, 797-800 (8th Cir. 2009) (holding
Section 27 does not completely preempt the field of state law
usury claims against state-chartered banks, and such claims are
not appropriate for removal to federal court).

The Court need not reach whether Congress intended Section
27 to provide the exclusive cause of action for usury claims
against state-chartered banks because, even if it does, Elevate
is not a state-chartered bank. Indeed, the District is not the
first plaintiff to bring a state law consumer protection
enforcement action against a non-bank entity that allegedly
"rents" a bank to provide predatory, high-interest loans to
consumers, nor is Elevate the first defendant to try to remove
this type of case to federal court on a jurisdictional theory of
complete preemption. The vast majority of courts that have been
confronted with the issue have concluded that the NBA and FDIA
do not completely preempt state law usury claims against a non-

bank.[3] The Court concludes the same here: because the only usury

claims in this case are against a non-bank entity, Section 27 is

not implicated and cannot provide a basis for removal

---

[3] *See Cmty. State Bank v. Knox*, 523 F. App'x 925, 929-30 (4th
Cir. 2014) (finding that "claims against the non-bank loan
servicers fall squarely outside the scope of the FDIA" and thus
"no federal subject-matter jurisdiction exists" over the
claims); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 297 (3d Cir.
2005) (finding that "removal was improper" where the complaint
asserted no claims against a national or state-chartered
federally insured institution); *Meade v. Marlette Funding LLC*,
Civ. Action No. 17-cv-00575-PAB-MJW, 2018 WL 1417706, at *2 (D.
Colo. Mar. 21, 2018) (remanding case after noting that "[c]ourts
in this Circuit and others have repeatedly held that when claims
are asserted against a non-bank entity, complete preemption does
not apply and remand to state court is warranted, even if the
non-bank defendant has a close relationship with a state or
national bank"); *Meade v. Avant of Colorado, LLC*, 307 F. Supp.
3d 1134, 1142-43 (D. Colo. 2018) (adopting and affirming a
magistrate's recommendation to remand the case to state court
where the plaintiff "ha[d] not asserted a claim against a state
bank"); *West Virginia v. CashCall, Inc.*, 605 F. Supp. 2d 781,
783 (S.D. W. Va. 2009) ("[B]ecause the State only asserts state
law claims against CashCall, a non-bank entity, the claims do
not implicate the FDIA, the FDIA does not completely preempt the
state-law claims, and there are no federal questions on the face
of the Complaint."); *Flowers v. EZPawn Okla., Inc.*, 307 F. Supp.
2d 1191, 1196, 1204 (N.D. Okla. 2004) (denying removal in a case
involving state law usury claims against defendants alleged to
have "enter[ed] into a 'sham' relationship" with state-chartered
banks "for the purpose of claiming federal preemption and
evading state usury, fraud and consumer protection laws" because
"[n]o claims have been brought against [the state-chartered
bank] in this lawsuit"); *Colorado ex rel. Salazar v. ACE Cash
Express, Inc.*, 188 F. Supp. 2d 1282, 1285 (D. Colo. 2002) ("The
Complaint *strictly* is about a non-bank's violations of *state*
law. It alleges *no* claims against a *national bank* under the
*NBA*.").

jurisdiction.[4] Elevate's arguments to the contrary are unavailing, for the reasons set forth below.

## 2. The District's Claims Are Directed at Elevate, a Non-Bank Entity, Not the State-Chartered Banks

Although the sole defendant is Elevate, and the Complaint contains no usury claims against FinWise or Republic, Elevate nonetheless urges the Court to find that Section 27 completely preempts the District's claims because the claims are all "based on or aimed at" high interest rates charged on loans originated by state-chartered banks. Def.'s Opp'n, ECF No. 23 at 17. Elevate maintains that it is merely a service provider used by FinWise and Republic and that the District's decision to bring this suit against it, rather than the banks, is a "creative pleading artifice" that "cannot [be used] to avoid the preemptive effect of Section 27 on removal." *Id.*

### a. The Complaint Adequately Alleges that Elevate is the True Lender

Courts that have addressed the complete preemption question in rent-a-bank cases like this one have wrestled with similar arguments, which non-bank entity defendants routinely make. In response, courts "have found it necessary to determine whether

---

[4] Because Section 27 is not implicated by the District's Complaint that includes state law usury claims against only a non-bank entity, Elevate's argument that the District could have "opt[ed] out of the preemptive effect[] of Section 27" is irrelevant. *See* Def.'s Opp'n, ECF No. 23 at 15.

the claims were actually directed against a federally or state-chartered bank," such that the preemptive force of federal banking law applies to the claims despite the fact that the claims were only brought against non-bank entities. *See CashCall*, 605 F. Supp. 2d at 785 (citing cases). Numerous courts have concluded that where a complaint "sufficiently allege[s]" a non-bank entity is the true lender of the allegedly usurious loans, the claims are properly directed at the non-bank entity rather than the state-chartered banks that originated the loans. *See Marlette*, 2018 WL 1417706, at *3 ("In circumstances where a plaintiff has sufficiently alleged that the non-bank entity is the true lender, courts have consistently come to the conclusion that complete preemption does not apply, 'even if the non-bank entity worked closely with the bank to administer loans.'"); *see also CashCall*, 605 F. Supp. 2d at 787 & n.9 (remanding case where "the State alleges that CashCall is the de facto lender," even though "there [wa]s a factual question as to the identity of the true lender"); *Flowers*, 307 F. Supp. 2d at 1206 (remanding case where "the Court has only the petition which . . . alleges throughout that EZCorp through EZPawn is the true lender."). Because the allegations in the Complaint govern, and as these cases persuasively demonstrate, the Court cannot exercise removal jurisdiction if "the allegations are insufficient for the undersigned to conclude as a matter of law

that [FinWise and Republic] and not [Elevate] [are] the true lender[s].” *See Flowers*, 307 F. Supp. 2d at 1206 (observing that “the Court must take the allegations as true for purposes of the motion to remand”); *see also Colon v. Ashby*, 314 F. Supp. 3d 116, 120 (D.D.C. 2018).

Upon careful review of the alleged facts, and in consideration of the relevant persuasive case law, the Court is satisfied that the District's claims are directed at Elevate, not FinWise and Republic. The Court cannot conclude, as a matter of law based on the allegations in the Complaint, that FinWise and Republic are the true lenders of the allegedly usurious loans marketed by Elevate and sold by Elevate to District residents. *See Flowers*, 307 F. Supp. 2d at 1206.[5] Moreover, the

---

[5] Elevate's argument that the “true lender rule” issued by the Office of the Comptroller of the Currency (“OCC”) in October 2020 is relevant to the Court's analysis of this issue, *see* Pl.'s Notice of Supp. Authority, ECF No. 27 at 1; is now moot. The rule, which pertained only to loans issued by national banks, purported “to determine when a national bank or Federal savings association (bank) makes a loan and is the ‘true lender,’ including in the context of a partnership between a bank and a third party, such as a marketplace lender.” *See National Banks and Federal Savings Association as Lenders*, 85 Fed. Reg. 68742 (Oct. 30, 2020), ECF No. 27-1 at 2. “Under this rule, a bank makes a loan if, as of the date of origination, it is named as the lender in the loan agreement or funds the loan.” *Id.* However, Congress passed a Congressional Review Act resolution rescinding the rule, and President Biden signed the resolution into law on June 30, 2021, noting that repealing the “true lender rule” would “protect borrowers against predatory lenders” that operated “so called ‘rent-a-bank’ schemes” to “prey on veterans, seniors, and other unsuspecting borrowers. White House, *Remarks by President Biden Signing Three*

District's suit targets several of Elevate's practices—such as deceptive marketing, misrepresentations, and failure to obtain a money lending license—and not just the provision of loans with interest rates that exceed the District's usury caps. This further convinces the Court that the District's suit aims to enforce the District's consumer protection laws against, and protect District residents from, Elevate specifically. *See Knox*, 523 F. App'x at 929-30.

Here, the District alleges that Elevate not only provides the website, marketing, analytics, software, and underwriting models for the Rise and Elastic loans—for which it holds the intellectual property rights—but it also "has the predominant economic interest in the loans it provides to District consumers via FinWise and Republic." Compl., ECF No. 1-2 ¶¶ 1, 17, 20, 21, 22. The District alleges Elevate receives revenue through two Cayman Islands special purpose vehicles—EE SPV and ESPV—that purchase a 96% interest in the receivables for the Rise loans and a 90% interest in the receivables for the Elastic loans, respectively. *Id.* ¶¶ 41, 42, 73, 75. According to the District,

*Congressional Review Act Bills into Law: S.J.Res.13; S.J.Res.14; and S.J.Res.15* (June 30, 2021 17:37), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/06/30/remarks-by-president-biden-signing-three-congressional-review-act-bills-into-law-s-j-res-13-s-j-res-14-and-s-j-res-15/. Accordingly, the OCC's "true lender rule" no longer has force or effect, and the Court need not consider it.

in 2019, Elevate's revenue from the Rise loans totaled over $390 million and its revenue from the Elastic loans totaled over $248 million. *Id.* ¶¶ 40, 72. The District alleges that Elevate: (1) directs and controls the funding of the Rise and Elastic loans, *id.* ¶¶ 37, 38, 69, 70, 71; (2) takes the risk of bad loans, including by providing credit protections to EE SPV and ESPV, *id.* ¶¶ 44, 45, 76, 77; and (3) acts as a servicer for the Rise and Elastic loans, through its subsidiaries, including by reconciling the accounts, posting payments and other credits to the accounts, and providing periodic billing statements, *id.* ¶¶ 47, 79.

There are many similarities between the rent-a-bank scheme that the District alleges Elevate orchestrated and the schemes allegedly perpetuated by non-bank defendants in the cases where courts have found that complaints sufficiently alleged that non-bank entities were the true lenders of the loans at issue. Each of these alleged rent-a-bank schemes is unique, but the Court is persuaded that the allegations in the Complaint are similar enough for the Court to conclude that the District has sufficiently alleged that Elevate is the true lender of the Rise and Elastic loans.

For example, in *Avant* and *Marlette*, the State of Colorado's banking administrator alleged that non-bank entities "provide[d] the website through which customers appl[ied] for [state-

chartered bank] Loans, . . . develop[ed] the criteria for making loans, . . . decide[d] which applicants w[ould] receive the loans, and [defendant] (or its affiliates) purchase[d] the loans within two days after they [we]re made." *Marlette*, 2018 WL 1417706, at *3 (quoting *Avant*, 307 F. Supp. 3d at 1147). The *Avant* decision also points out that the non-bank entity in that case "service[d] and administere[d] the loans, [bore] all the risk on the loans in the event of default, pa[id] all the legal fees and expenses related to the lending program, retain[ed] 99% of the profits on the loans, and indemnifie[d] [the bank] against all claims arising from [the bank's] involvement in the loan program." *Avant*, 307 F. Supp. at 1147. In both cases, the district court found that "plaintiff sufficiently alleges that defendant is the 'true lender.'" *Marlette*, 2018 WL 1417706, at *3 (citing *Avant*, 307 F. Supp. 3d at 1147).

Furthermore, in *Flowers,* the plaintiff alleged that defendant EZPawn made payday loans through checks drawn from a bank, but EZPawn and its affiliate EZCorp, not the bank, together "carrie[d] out all interaction with the borrowers, accept[ed] the ultimate credit risk, collect[ed] and pocket[ed] virtually all of the finance charges and fees, and own[ed] and control[led] the branding of the loans which [we]re available only at its pawnshops." 307 F. Supp. 2d at 1205. Despite the defendants' argument that they merely acted as servicers for

loans made by a state-chartered and federally insured bank, the court concluded that the allegations did not support a finding that the bank was the true lender and the petition's state law claims were directed against the non-bank defendants. *Id.*

Finally, in *CashCall*, the State of West Virginia alleged that defendant CashCall, Inc. marketed loans to consumers as an agent of a South Dakota-chartered bank, the bank approved and directly funded the loans, and CashCall would purchase the loans three days later pursuant to the terms of an agreement with the bank. 605 F. Supp. 2d at 783. Based on these facts, the court found that the usury claims in the complaint were directed only against CashCall. *Id.* at 786.

The Court is unpersuaded by Elevate's argument that the "lending program arrangements at issue [in *Avant* and *Marlette*] are inapposite to the service provider structure that exists between Elevate and the Banks." *See* Def.'s Opp'n, ECF No. 23 at 20-21. Though Elevate contends it is only a service provider, the scheme alleged in the Complaint is similar to the "lending program arrangements" in *Avant* and *Meade* (as well as the other cases discussed above). *Compare Avant*, 307 F. Supp. 3d at 1147 ("Avant develops the criteria for making the loans")*, with* Compl. ¶ 20 ("Elevate also provides the analytics, software, and underwriting models to FinWise and Republic for the provision of Rise and Elastic loans"); *compare Avant*, 307 F. Supp. 3d at 1147

("Avant (or its affiliates) purchases the loans within two days after they are made by WebBank . . . [and] retains 99% of the profits on the loans"), *with* Compl. ¶¶ 41, 73 ("[A] Cayman Islands special purpose vehicle that operates for the financial benefit of Elevate[] has purchased a 96% interest in the receivables for the [Rise] loans . . . [and] a [different] Cayman Islands special purpose vehicle that operates for the financial benefit of Elevate[] has purchased a 90% interest in the receivables from the {Elastic] loans . . . . These receivables generate income for Elevate."); *compare Avant*, 307 F. Supp. 3d at 1147 ("[Avant] services and administers the loans"), *with* Compl. ¶¶ 47, 79 ("Elevate, through one of its subsidiaries, acts as the servicer for the {Rise and Elastic} loans. Its duties as a servicer include reconciling the accounts, posting payments and other credits to the accounts, and providing periodic billing statements."); *compare* 307 F. Supp. 3d at 1147 ("[Avant] bears all the risk on the loans in the event of default"), *with* Compl. ¶¶ 45, 77 ("Elevate provides credit protection to [the Cayman Islands special purpose vehicles] against [Rise and Elastic] loan losses. This credit protection places the risk of losses on Elevate.").

### b. The Court Need Not Resolve Factual Disputes at This Juncture

The Court acknowledges that Elevate disputes a number of the District's factual allegations and presents additional facts to counter the District's true-lender allegations. *See* Def.'s Opp'n, ECF No. 23 at 9-10.[6] But the Court need not resolve those factual disputes on a motion for remand. *See Colon v. Ashby*, 314 F. Supp. 3d 116, 120 (D.D.C. 2018) ("[T]he court must assume all of the facts set forth by plaintiff to be true and resolve all uncertainties as to the state substantive law in favor of the plaintiff" on a motion for remand); *see also Flowers*, 307 F. Supp. 2d at 1206 (stating that "the Court must take the allegations as true for purposes of the motion to remand," and noting that the court had before it only the plaintiff's

---

[6] Elevate submits the following: (1) FinWise and Republic "review[] and approve[] all marketing materials and campaigns and determine[] the underwriting strategies and score cutoffs used in processing applications"; (2) FinWise and Republic "define all program parameters and provide full compliance oversight over all aspects of their respective programs as required by federal law"; (3) Elevate does not own or purchase any interest in the Rise or Elastic loans after the banks originate them; (4) the banks retains ownership of the accounts associated with their respective credit products at all times; (5) EE SPV and ESPV purchase participation interest in the loans after origination, which it explains is "distinct from" purchasing the loan itself because it "grants the purchaser the right to receive amounts derived from repayment of the loan," but "ownership of the loan and the customer account remain with the originating bank"; (6) an Elevate subsidiary provides credit protection to investors in EE SPV and ESPV; and (7) Elevate does not have an ownership interest in EE SPV or Elastic SPV. Def.'s Opp'n, ECF No. 23 at 9-10.

petition and not all relevant agreements between the non-bank entity and bank); *Dandy v. Wilmington Fin., Inc.*, Civ. No. 08-1027 JCH/GBW, 2010 WL 11493721, at *7 (D.N.M. May 3, 2010) (where a non-bank entity argued it merely facilitated allegedly illegal residential mortgage loans on behalf of a federal savings bank, the court observed that "this contention merely raises a factual question and cannot create federal jurisdiction"). This is consistent with precedent in this circuit that holds "federal jurisdiction is disfavored for cases that are 'fact-bound and situation-specific'." *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010).[7]

The Court is also unpersuaded by Elevate's suggestion that *Krispin v. May Department Stores*, 218 F.3d 919 (8th Cir. 2000) and *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009), direct the Court to conduct a searching factual analysis that looks beyond the face of the Complaint to determine the real party in interest in this case. *See* Def.'s Opp'n, ECF No. 23 at 23. In *Krispin*, the Court

---

[7] Elevate's reference to this Court's decision in *State Farm Bank, F.S.B. v. District of Columbia*, 640 F. Supp. 2d 17, 24 (D.D.C. 2009)—in support of its argument that the Court must conduct a real party interest analysis that looks beyond the face of the pleadings—is misplaced. *See* Def.'s Opp'n, ECF No. 23 at 19 & n.9. That case had nothing to do with whether the Court had jurisdiction over the case upon removal from Superior Court; instead, the Court was analyzing whether federal law preempted the District's mortgage regulations when ruling on cross-motions for summary judgment. *See State Farm*, 640 F. Supp. 2d at 18.

of Appeals for the Eighth Circuit ("Eighth Circuit") considered whether state law usury claims against a department store that entered credit agreements with customers but later assigned those accounts to a bank, while still maintaining a role in the collection process and purchasing the receivables from the bank on a daily basis, were claims directed at the bank rather than the defendant store. 218 F.3d at 923-24. The court found that the bank was the real party in interest, having determined that "in these circumstances . . .. it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies" and completely preempts the state law usury claims. *Id*. at 924. Courts have since correctly questioned whether "this factual determination based on state law should be made in the first instance by a federal court on removal rather than the state court." *Flowers*, 307 F. Supp. 2d at 1206. Relatedly, *Krispin* was decided in a different procedural posture, as the *Flowers* court noted: "the Eighth Circuit and the district court decided the issue on a motion for summary judgment, finding there was no genuine issue of material fact that the bank was the real party in interest." *Id*. Finally, as the District correctly points out, numerous courts have distinguished *Krispin* on its facts, noting that there was no dispute that the bank was a wholly-owned subsidiary

of the department store. *See* Pl.'s Reply, ECF No. 25 at 13-14 & n.9 (citing cases).

*Vaden* is likewise unpersuasive. There, the Court of Appeals for the Fourth Circuit ("Fourth Circuit") held that a bank was the real party in interest to a counterclaim in a lawsuit where a loan servicer sued to collect credit card debt and the debtor filed counterclaims asserting violations of state usury laws against the loan servicer. 489 F.3d at 603. The Fourth Circuit observed that an analysis of the real party in interest was necessary given the "unique and complex relationship among the parties" and to prevent plaintiffs from "artfully plead[ing] state law claims against a non-bank defendant and thus frustrate Congress' intent that certain causes of action are always federal." *Id.* at 601 & n.5.

Elevate fails to address a subsequent Fourth Circuit decision in a case that more closely resembles this case than *Vaden* does. *See Knox*, 523 F. App'x 925. In *Knox*, the Fourth Circuit called into question whether its own decision in *Vaden* remains good law and, in any event, found *Vaden* unpersuasive based on the distinguishing facts evident on the face of the complaint. *See Knox*, 523 F. App'x at 929-30 ("Even if [the real party in interest analysis] remains intact after the Supreme Court's reversal, *see Vaden II*, 556 U.S. 49, 129 S. Ct. 1262, we would not reach the same result in the present case."). The

Fourth Circuit concluded that "determination of which party controlled the loan terms is far less integral here than in *Vaden*," noting that the claims in the complaint "specifically target several practices of the loan servicers" and "unpaid debts are not at issue." *Id.*

For the same reasons the Fourth Circuit in *Knox* found its earlier decision in *Vaden* unpersuasive when evaluating whether a non-bank entity could claim protection from state law consumer protection and usury claims by invoking Section 27's preemptive force, so too does this Court. As in *Knox*, the District's claims "do not merely challenge certain terms of the loans, but instead specifically target several practices of the loan servicers." *Id*. at 929. As the District points out, of the four counts in the District's Complaint, three "do not turn on usury at all." Pl.'s Reply, ECF No. 25 at 9-10.[8] Where, as here, a state targets several of a non-bank entities' practices in a consumer

---

[8] Count I concerns Elevate's alleged deceptive marketing of the Rise and Elastic loans, alleging that Elevate violated the CPPA by "misrepresenting the cost and legality of the loans and failing to disclose the interest rates of its loans." *Id.* at 10 (citing Compl., ECF No. 1-2 ¶¶ 80-88). Count II concerns Elevate's alleged failure to disclose the true costs of the Rise and Elastic loans, in violation of the CPPA's prohibition on unfair and unconscionable practices. *Id*. (citing Compl., ECF No. 1-2 ¶¶ 89-92). Count IV concerns Elevate's alleged failure to obtain a money lending license in the District, and whether Elevate is in violation of the CPPA even if it is not the true lender of the Rise and Elastic loans. *Id.* at 10-11 (citing Compl., ECF No. 1-2 ¶¶ 100-103).

protection enforcement action, "[t]he totality of the Complaint shows that the State's suit is directed against a single, specific entity violating a host of state laws including the usury law," and that entity is the non-bank, not the bank. *See CashCall*, 605 F. Supp. 2d at 786. Indeed, in contrast to *Vaden* and *Krispin,* where customers sought money damages caused by specific usurious fees, when a state brings a consumer protection enforcement action it is "seeking relief from the harmful conduct of a *specific entity* . . . that does not benefit from the privileges conferred by the FDIA, [and thus] the fact that a state-chartered bank might be the true lender responsible for alleged usurious loans is less significant . . . . [T]he bank is not the targeted entity and cannot provide the sought relief even if it turns out to be the real lender; the non-bank entity would remain the target." *Id.* at 788; *see also Knox*, 523 F. App'x at 930. That is the situation here—the District's suit seeks to protect District residents from Elevate based on several practices that are allegedly harmful to its consumers, and that remains true even if Elevate is not in fact the true lender of the Rise and Elastic loans. *See* Pl.s Reply, ECF No. 25 at 9-11.

Further counseling against conducting a fact-intensive analysis at this stage to determine the true lender of the Rise and Elastic loans is that even if the Superior Court were to

conclude on remand that Elevate is not, in fact, the true lender, that "will not result in [FinWise's or Republic's] liability or regulation under state laws, but will merely relieve [Elevate] of liability under those laws." *CashCall*, 605 F. Supp. 2d at 787. If the Superior Court instead concludes that Elevate is the true lender, as the District alleges, Elevate may be liable under the District's usury laws. But in either situation, the state-chartered banks' rights to make loans and charge FDIA-permitted interest rates in the District will not be affected. *Id.*

Accordingly, based on the facts alleged in the Complaint, the Court rejects Elevate's argument that the District's state law claims amount to claims against FinWise and Republic that are completely preempted by Section 27 of the FDIA. While the Superior Court may conclude on remand that FinWise and Republic are in fact the true lenders of the Rise and Elastic loans, that factual dispute does not create federal jurisdiction here.

### 3. The FDIC's "Pervasive" Regulatory Oversight of State-Chartered Banks Does Not Give Rise to Complete Preemption Jurisdiction

In arguing that Section 27 completely preempts the District's state law claims, Elevate repeatedly invokes the FDIC's "pervasive regulatory scheme" and "detailed framework for "overseeing the relationship between regulated state banks and their third-party service providers." *See* Notice of Removal, ECF

No. 1 at 1; Def.'s Opp'n, ECF No. 23 at 18, 20, 21-22. Elevate
points to the Bank Service Company Act, which "allows state-
chartered banks to engage service providers like Elevate, by
contract or otherwise, to perform bank-related function on
behalf of the bank" and "subject[s] [service providers] to
regulation and examination by the FDIC as if the services were
provided by the bank itself." *Id.* ¶ 35 (citing 12 U.S.C. §
1867(c)). Elevate also points to formal and informal guidance
issued by the FDIC relevant to the relationship between state-
chartered banks and their service providers, including for
"services performed in connection with a bank lending program by
technology-enabled service providers like Elevate." *See* Def.'s
Opp'n, ECF No. 23 at 17-18 (citing Notice of Removal, ECF No. 1
¶¶ 34-42). Finally, Elevate points to final rules issued by the
FDIC and OCC in June 2020 "formalizing the valid-when-made
doctrine, which holds that a loan that was valid when made will
not be rendered usurious by a subsequent transfer." *Id.* at 21-22
& n.11 (citing *Federal Interest Authority*, 85 Fed. Reg. 44146
(July 22, 2020); *Permissible Interest on Loans That Are Sold,
Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33530 (June 2,
2020)). Elevate argues that this "federal banking scheme
encompasses and *encourages* Elevate's activities as a service
provider and allows Elevate to enable banking operations under
the purview of the FDIA and FDIC's supervision without regard to

state usury laws." *Id.* (citing Notice of Removal, ECF No. 1 ¶¶ 34-44, 62-67).

The District, on the other hand, invokes the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") to argue that Section 27 should not be interpreted as completely preempting state law usury claims against non-bank entities. *See* Pl.'s Mot., ECF No. 15 at 20 & n.6. The District contends that the Dodd-Frank Act clarified that the statute should not "be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." *Id.* (citing 12 U.S.C. §§ 25b(b)(2), ℂ, (h)(2)). Elevate disagrees. *See* Def.'s Opp'n, ECF No. 23 at 17 n.7.

These arguments, however, are not particularly relevant to the issue of complete preemption, pursuant to which the Court determines whether it can exercise removal jurisdiction because Congress intended for a law's preemptive force to be "so extraordinary" that it replaces state law entirely and permits removal, not whether federal law preempts state law in the ordinary sense. *See Caterpillar Inc.*, 482 U.S. at 392-93 (distinguishing ordinary federal preemption, which is raised as a defense to allegations in a plaintiff's complaint and cannot serve as the basis for removal, from the "complete pre-emption" doctrine); *see also Lehmann v. Brown*, 230 F.3d 916, 919-920 (7th

Cir. 2000) ("[T[he phrase 'complete preemption' has caused confusion . . . by implying that preemption sometimes permits removal. Unfortunately, 'complete preemption' is a misnomer, having nothing to do with preemption and everything to do with federal occupation of a field . . . . State law is 'completely preempted' in the sense that it has been replaced by federal law—but this happens because federal law takes over all similar claims, not because there is a preemption defense.").

While Section 27 may have the requisite preemptive force to permit removal of state law usury claims against state-chartered banks, neither the District nor Elevate has cited any cases that would support a conclusion that Congress intended Section 27 of the FDIA to completely preempt state law claims against non-bank entities that are nowhere mentioned in the plain language of the statue simply because a "detailed regulatory framework" addresses the relationship between state-chartered banks and non-bank entities. Elevate's discussion of *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 304-05 (1978) and related cases is inapposite. *See* Notice of Removal, ECF No. 1 at ¶¶ 63-67. *Marquette* is not a removal case and does not address complete preemption. Likewise, *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014) did not discuss complete preemption or removal jurisdiction, despite Elevate's claim that it "appl[ied] complete preemption to claims

39

involving agents of state-chartered banks." *See* Notice of Removal, ECF No. 1 ¶ 67. In fact, the court in *Sawyer* explicitly distinguished that case from removal cases, noting that "a case relevant to questions of complete preemption in which a court must consider whether a case can be properly removed to federal court based on federal question jurisdiction [is] inapposite here where the case is already properly in federal court." *Sawyer*, 23 F. Supp. 3d at 1369.

Accordingly, the Court concludes that Elevate's arguments concerning the FDIC's "pervasive regulatory scheme" governing state-chartered banks and their service providers do not affect the Court's finding that Section 27 of the FDIA does not completely preempt the District's state law usury claims against Elevate.[9] As such, the Court holds that Section 27 of the FDIA does not completely preempt the District's state law claims against Elevate, a non-bank entity, and it does not provide a basis for this Court to exercise removal jurisdiction.

---

[9] That is not to say that ordinary preemption is not a viable defense under the FDIA—Elevate is "free to raise preemption as a defense to this action in Superior Court, and ultimately seek federal-court review by petitioning the Supreme Court for certiorari if [Elevate] lose[s] in Superior Court." *See U.S. Airways Master Exec., Council, Air Line Pilots Ass'n, Int'l. v. Am. W. Master Exec. Council*, 525 F. Supp. 2d 127, 135 (D.D.C. 2007).

**B. The Significant Federal Issue Doctrine Is Not A Basis For Removal**

Having concluded that federal law does not completely preempt the District's state law claims against Elevate in this consumer protection enforcement action, the Court now turns to Elevate's second asserted basis for removal: the significant federal issues doctrine. *See* Notice of Removal, ECF No. 1 ¶¶ 76-90. For the Court to exercise removal jurisdiction over a purely state law claim under this narrow exception to the well-pleaded complaint rule, a federal issue would have to be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. 308). This so-called *Grable* exception is extremely rare and only creates federal subject-matter jurisdiction in a "special and small" category of cases. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006). As courts in this district have observed, "[i]t takes more than a federal element to establish federal question jurisdiction under the *Grable* framework, . . . and courts have confined *Grable* to those rare state-law claims posing a context-free inquiry into the meaning of federal law." *Flavell v. Int'l Bank for Reconstruction and Dev.*, Civ. Action No. 20-623 (CKK), 2021 WL 1146301, at *7 (D.D.C. Mar. 25, 2021) (quoting

*Washington Consulting Grp., Inc. v. Raytheon Tech. Servs. Co., LLC*, 760 F. Supp. 2d 94, 101-102 (D.D.C. 2011)).

Elevate contends that the Court may exercise federal-question subject-matter jurisdiction over this case because of the "significant issues of federal law that must be resolved to determine the viability of the Complaint's state law claims." Notice of Removal, ECF No. 1 ¶ 80. Elevate seems to contend that the "significant issues of federal law" the require resolution here are "the federal statutes, regulations and regulatory guidance applied to state-chartered banks and their service providers." *Id.* ¶ 80. "Whether the fact pattern in this case is subject to the 'true lender' analysis set forth in the Complaint," Elevate argues, "and whether that analysis can displace the longstanding and robust federal regulatory scheme that authorizes the exportation of interest rates and the use of service providers by state-chartered banks will involve, in the words of *Grable*, the 'validity,' 'construction' and 'effect' of federal law." *Id.*

Elevate's arguments are a misapplication of *Grable* because the District's claims do not "necessarily raise a stated federal issue." *Grable*, 545 U.S. at 314. In *Grable*, the plaintiff asserted that because a federal statue requiring notice of the seizure of property was not complied with, plaintiff should have good title to certain seized land. *Id.* at 311. That is, the

plaintiff's action was *based on* a federal statute. The same is
true of the D.C. Circuit case on which Elevate relies. *See*
*Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (federal
stock savings association asserted that because a federal
regulation did not entitle two former directors and the former
CEO to indemnification of expenses arising from a shareholder
securities law suit, the individuals were in breach of contract
for their failure to repay legal fees). Conversely, the District
does not rely on any federal statute or regulation to bring its
claims. Instead, the District's action has been brought *despite*
Elevate's assertion that the FDIA, FDIC, and federal regulation
permit the conduct that the District alleges Elevate undertook
in violation of the District's laws. *See, e.g.*, Notice of
Removal, ECF No. 1 ¶ 81 ("The Complaint alleges that the
structure of the loan transactions and the interest rate they
implement are unlawful under state law *without regard to* the
federal statutes, regulations or guidance, or the FDIC's
regulatory oversight." (emphasis added)). Elevate's arguments
are properly understood as an assertion of a federal preemption
defense, which cannot serve as the basis for federal subject-
matter jurisdiction. *See Animal Legal Def. Fund v. Hormel Foods*
*Corp.*, 249 F. Supp. 3d 53, 58 (D.D.C. 2017) (citing *Caterpillar*
*Inc.*, 482 U.S. at 393) (a federal preemption defense "by its
very nature is not 'necessarily raised' by Plaintiff's

Complaint, and indeed it is black letter law that 'a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption").

Moreover, the main issue in this case is the identity of the true lender of the Rise and Elastic loans. The true-lender question is substantially factual, and the Superior Court is well equipped to handle it, as many state courts have done in the similar rent-a-bank cases cited throughout this Memorandum Opinion. Conversely, substantial and necessarily raised federal issues warranting federal subject-matter jurisdiction are ones "posing a context-free inquiry into the meaning of federal law." *See Flavell*, 2021 WL 1146301, at *7. They are not "fact-bound and situation-specific." *See McVeigh*, 547 U.S. at 701. In the only case the parties identified that involves both an alleged rent-a-bank scheme and an assertion of federal jurisdiction under the *Grable* exception, the district court concluded that the issues surrounding the alleged true lender and whether preemption would apply merely raised a factual question, rather than a legal question that called for the interpretation of federal statutes, making removal on this basis improper. *See Dandy*, 2010 WL 11493721, at *7. The same is true here.

Because no substantial federal issues are necessarily raised by the District's Complaint, the Court concludes that the

significant federal issues doctrine does not provide a basis for federal subject-matter jurisdiction in this case.

## IV. Conclusion

Accordingly, for the reasons set forth above, the Court **GRANTS** the District's Motion to Remand to State Court. This case shall be remanded to Superior Court. An appropriate order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**      **Emmet G. Sullivan**
               **United States District Judge**
               **July 15, 2021**